UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
EQUISHA JACOBS and JOHN M. TOMSKY,          :
Guardian Ad Litem for Jacques Jacobs, an Infant,
                                            :
                    Plaintiffs,
                                            :
        -against-                              **MEMORANDUM OPINION AND**
                                            :          **ORDER**

UNITED STATES OF AMERICA, ROSARIO           :       08 Civ. 8061 (KNF)
FERRER VILLASENOR, NP, and BRONX
LEBANON HOSPITAL CENTER,                    :

                    Defendants.             :
-------------------------------------------------------------X
KEVIN NATHANIEL FOX
UNITED STATES MAGISTRATE JUDGE

     Before the Court is an application by John M. Tomsky ("Tomsky"), guardian ad litem for

the infant Jacques Jacobs ("JJ"), in this medical malpractice and loss of services action against

the United States of America, Rosario Ferrer Villasenor, NP ("Villasenor") and Bronx Lebanon

Hospital Center ("BLH"), for an order approving the settlement of the action, pursuant to Local

Civil Rule 83.2 of this court and New York Civil Practice Law and Rules ("CPLR") §§ 1201-

1211.  The plaintiffs, Equisha Jacobs ("Jacobs") and Tomsky, are represented by the law firm

Silberstein, Awad & Miklos, P.C.  Having considered the application and based on the record in

this case, including the infant compromise hearings conducted on July 19, 2011, and August 2,

2012, as well as the reasons that follow, the Court finds that the proposed settlement agreement

reached by the parties to the action is in the best interest of the infant.

## PROCEDURAL HISTORY

    Plaintiff Jacobs, individually, and as the "Mother and Natural Guardian" of her infant son

JJ, brought this medical malpractice and loss of services action for damages due to injuries

alleged to have been sustained during the course of Jacobs's pre-natal, labor, delivery, and post-natal medical care and treatment provided by the defendants in connection with JJ's birth, in 2006. Jacobs alleged that the defendants provided inadequate, improper and untimely monitoring and management of her high-risk labor and delivery of JJ at BLH, Bronx County, New York. She asserted that, as a result, JJ suffered severe bradycardia and related metabolic acidosis, including permanent neurological damage involving spastic motor disability, brain injury, physical, mental and cognitive disabilities. The parties consented to proceed before a United States magistrate judge for all purposes, pursuant to 28 U.S.C. § 636(c) and Rule 73 of the Federal Rules of Civil Procedure. On April 5, 2010, the parties informed the Court that they had reached a global settlement agreement.

In July 2011, the plaintiffs filed various documents, seeking approval of the proposed settlement agreement. On July 19, 2011, the Court conducted an infant compromise hearing and directed the plaintiffs to submit supplemental materials. On November 7, 2011, due to various procedural and substantive deficiencies in the plaintiffs' submissions, the Court directed the plaintiffs to: (a) serve and file their motion to settle this action, in compliance with New York law, the Federal Rules of Civil Procedure, the Local Civil Rules of this court, the Electronic Court Filing Rules and Instructions and the Court's Individual Rules of Practice; and (b) serve and file a status report regarding the alleged New York City Human Resources Administration, Department of Social Services, lien. On November 18, 2011, the Court directed the parties to submit written briefs addressing whether the settlement in this action is subject to the New York State Medical Indemnity Fund (the "MIF" or the "Fund"), New York Public Health Law ("PHL") §§ 2999-g-2999-j.

On February 22, 2012, the Court: (1) denied the plaintiffs' motion to settle this action

because it contained inconsistent and conflicting statements making the proposed settlement agreement ambiguous and vague, was deficient and granting it was not in the best interest of the infant; and (2) determined that the MIF applies in this case because no judgment or court-approved settlement agreement existed prior to the enactment of the MIF.  On the same date, the Court removed Equisha Jacobs "as Mother and Natural Guardian" of JJ, as that was in the best interest of the infant, and appointed Tomsky to serve as the infant's guardian ad litem, effective on the date of his consent to the appointment.  Tomsky consented to the appointment.

On April 20, 2012, Jacobs, "as mother and natural guardian" of JJ and individually, filed a notice of appeal from the denial of the plaintiffs' motion to settle and compromise the action and the Court's determination that the MIF applies, Docket Entry No, 86, and from the order removing her as JJ's representative and appointing a guardian ad litem, Docket Entry No. 88. The appeal was dismissed on June 28, 2012, Docket Entry No. 114.

On June 8, 2012, Tomsky filed a motion for an order to approve the settlement.  On August 2, 2012, the Court conducted a hearing, because it had questions about certain documents submitted on the motion, namely the proposed: (1) settlement agreement; (2) trust; (3) releases; and (4) hold harmless instrument.  The hearing was attended by the parties as well as Jay Sangerman, Esq. ("Sangerman"), the attorney who drafted the proposed trust, and Marvin Kipnes ("Kipnes"), a principal of Kipnes Crowley Group LLC, advisors in structured settlements.  The Court made inquiries of Tomsky, the attorneys for the parties, Sangerman and Kipnes concerning the proposed settlement agreement and trust, as well as other documents submitted on the motion.  Thereafter, the parties made supplemental submissions to the Court. The following documents, in support of the instant motion, are before the Court: (1) medical records, Exhibits D and E to the Supplemental Attorney's Affirmation by Joseph P. Awad

3

("Awad"), dated August 3, 2011, Docket Entry No. 60; (2) Notice of Motion, Docket Entry No.

106; (3) Attorney Affirmation of Douglas Kaplan, dated May 22, 2012, Docket Entry No. 107;

(4) Affirmation of Sangerman, dated May 30, 2012, Docket Entry No. 108; (5) Parent Affidavit,

dated June 1, 2012, Docket Entry No. 109; (6) Affidavit of Guardian Ad Litem, Tomsky, dated

June 7, 2012, Docket Entry No. 110; (7) Attorney Affirmation by Awad, dated June 8, 2012,

Docket Entry No. 112; (8) Attorney Affirmation by Robert Miklos, dated September 7, 2012,

Docket Entry No. 119[1]; (9) Attorney Affirmation by Robert Miklos, dated September 10, 2012,

Docket Entry No. 121; (10) Affidavit of Services of Guardian Ad Litem, dated September 12,

2012, Docket Entry No. 124; and (11) Attorney Affirmation by Awad, dated September 26,

2012, Docket Entry No. 126.

## BACKGROUND

Tomsky is the guardian ad litem for JJ and resides in Stanford, Connecticut.  JJ was six

years old on January 14, 2012, and he lives with his mother, Jacobs, in Bronx County, New

York.  The following are the circumstances giving rise to this action:

On January 13, 2006, shortly after 5:00 p.m., Jacobs's labor began.  Jacobs was sixteen

years old and had experienced a significant increase in weight.  Between 6:00 p.m., on January

13, and 12:30 a.m., on January 14, 2006, a significant loss of beat-to-beat variability and lack of

progress in labor occurred; allegedly, these conditions were not recognized timely.  On January

14, 2006, Jacobs gave birth to a male child, JJ.  JJ was born prematurely, via emergency cesarian

section secondary to prolonged, unrelieved fetal bradycardia.  The unrelieved bradycardia

produced metabolic acidosis, which JJ suffered in utero and immediately upon his birth.  The

---

[1]  The Attorney Affirmation, dated September 7, 2012, Docket Entry No. 119, supersedes
the Attorney Affirmation, dated June 29, 2012, that is Docket Entry No. 115.

complaint alleged that an intervention by cesarian section, before midnight and before the fetal

oxygen reserve was completely depleted, would have protected JJ from sustaining unrelieved

fetal bradycardia and its consequences.

Upon birth, JJ was determined to be suffering from severe perinatal and respiratory

depression.  He was intubated and placed on mechanical ventilation.  On January 14, 2006,

around 2:00 a.m., JJ was transferred to the BLH neo-natal intensive care unit ("NICU"), where

he remained until May 15, 2006, when he was discharged temporarily to a foster mother, due to

his medical condition and because, at that time, Jacobs was in foster care under the auspices of

the New York City Human Resources Administration, Department of Social Services.  A

computed topography scan, performed on January 17, 2006, revealed that JJ had a hyperdense

intraventricular hemorrhage within the left occipital horn and scalp soft tissue swelling was seen

overlying the right parietal calvarium near the vertex.  On March 1, 2006, a magnetic resonance

imaging ("MRI") test of JJ's brain was performed, resulting in a diagnosis of hypoxic ischemic

encephalopathy.  Mild dilation of lateral ventricles, superior interhemispheric fissure and frontal

convexity sulci was described, and an enlarged extra-axial cerebral spinal fluid space was noted

at the anterior and inferior margin of the left temporal lobe in the left middle cranial fossa.  The

previously documented intraventricular hemorrhage in the left occipital horn was no longer

visualized.  At the time of JJ's discharge from the NICU, he was also diagnosed with perinatal

depression, metabolic acidosis and seizures.

A June 17, 2010 Children's Aid Society, Medical Foster Care Program Medical

Summary (the "summary") indicates that JJ was diagnosed with gastroesophageal reflux disease,

reactive attachment disorder, developmental delays and hypoxic ischemic encephalopathy.  The

summary notes that, while JJ was in NICU, he was placed on nasal continuous positive airway

pressure for four weeks and treated for seizures with Phenobarbital.  On August 17, 2006, he had a myringotomy tube placement.

On March 17, 2007, JJ was taken to Montefiore Medical Center, where he had a gastronomy tube placed due to dislodgment.  On April 11, 2007, JJ underwent a tonsillectomy and adenoidectomy due to obstructive sleep apnea.  An examination, performed on October 23, 2007, revealed a normal electroencephalography.  An MRI test of the brain, performed on the same date, revealed enlarged ventricles and underdeveloped white matter.

A comprehensive eye examination, performed on September 23, 2008, revealed pseudo strabismus due to epicanthal folds in the left eye.  A comprehensive audiological evaluation was also performed on the same date, revealing possible severe hearing loss in the composite hearing ear.  Individual ear audition could not be specified based on soundfields measures and unmasked stimuli and JJ's auditory sensitivity was judged inadequate for the development of communication skills and was a likely contributor to his developmental delays.  On November 11, 2008, JJ had an endoscopic procedure, under anesthesia.  He was subsequently treated with Prevacid, Reglan and Pepcid, and was administered Pediasure, four cans per day, to meet caloric goals, in addition to his intake of solid food.

On January 7, 2009, bilateral myringotomy tubes were placed.  JJ has a history of chronic otitis.  On July 8, 2009, JJ was evaluated by a pulmonary specialist who prescribed medication for nasal congestion.  He was doing well, "eating PO without choking," sleeping through the night without fragmentation, exhibiting mild snoring and no apnea.  Seizure activity was reported during the neonatal period.  JJ underwent various immunizations between April 2006 and February 2010.

On October 8, 2009, Joseph Carfi, an assistant clinical professor with the Department of

6

Rehabilitation Medicine, Mount Sinai Medical Center ("Dr. Carfi"), reviewed JJ's medical records from the Children's Aid Society, "Westchester County Department of Health Children with Special Needs," Montefiore Medical Center and BLH, and prepared a Life Care Plan for JJ, taking into consideration medical care costs, such as rehabilitative specialist, gastroenterologist, pulmonary specialist, orthopedist, medication, medical supplies and equipment, home equipment adaptations, transportation, various therapies, such as physical, occupational and speech-language, as well as a choice of home and facility care. Dr. Carfi estimated that the annualized cost for a home-care services option for JJ would be: (1) $48,676.40, to age 16; (2) $76,193.75, for ages 16-21; and (3) $78,103.71, at age 21. He estimated that the annualized cost for a facility-care services option for JJ would be: (a) $438,000, to age 16; (2) $438,000, for ages 16-21; and (3) $74,660.75, at age 21.

On October 11, 2009, Robin E. Smith ("Dr. Smith"), a child neurologist, reviewed JJ's medical records and noted that JJ "was a 34 week AGA premature infant who had a sustained fetal bradycardia for about 20 minutes," and he was born with "severe neonatal encephalopathy at birth with low Apgar scores and severe metabolic acidosis." Dr. Smith opined, with a reasonable degree of medical certainty, that "the clinical presentation in [JJ] is strongly suggestive of an intrapartum timing of the Hypoxic Ischemic Encephalopathy."

On October 12, 2009, Alan M. Leiken, Ph. D. ("Dr. Leiken"), an economist, prepared an economic loss analysis ("ELA"), showing the future cost of health care and income loss, based on Dr. Carfi's Life Care Plan for JJ. Dr. Leiken stated that he increased the cost of medical supplies and equipment, home equipment and nutritional supplement by 2.75% per year. He also increased the cost of medications by 5% per year and other costs by 4% per year. Dr. Leiken explained that his increases were based on data provided by the United States Bureau of

Labor Statistics over the past 25 years, showing that the costs for health care have been increasing at an average annual rate of approximately 5.5%.  According to Dr. Leiken, he determined the future cost, commencing January 1, 2010, and continuing over the remainder of JJ's life expectancy, which, based on data provided by the United States Center for Health Statistics, for a male of JJ's age is 74.2.  Based on Dr. Carfi's identification of two options for JJ, Dr. Leiken determined the present value of the future cost by using the total future non-discounted cost for the home-care option ($34,672,015), and the facility-care option ($36,912,934) and applying an interest rate of 3.4%, which was the current rate on the 10 year Treasury bond, to obtain the following: (a) $8,749,201, for the home-care option; and (b) $13,149,306, for the facility-care option.  Dr. Leiken assumed that JJ would have been a high school graduate and he would earn the average annual income of a male high school graduate, which, according to the 2007 United States Census Bureau, Current Population Survey, was $36,839.  He increased that figure by 3.3% per year, which is the average wage increase per year over the past 20 years.  Dr. Leiken determined that the income loss commencing the first full year after reaching age 18 and continuing until retirement at age 67, which is the normal retirement age considered for someone JJ's age by the Social Security Administration, is $7,525,115.  The present value of the income loss using an interest rate of 3.4% is $1,879,604.

On July 15, 2010, an "Order (Adjournment in Contemplation of Dismissal)" was entered in the proceeding entitled "In the Matter of Jacques Jacobs (DOB: 1/14/2006, CIN # DY47323K) A Child Under Eighteen Years of Age Alleged to be Neglected by Equisha Jacobs, Respondent," in the Family Court of the State of New York.  The July 15, 2010 order provided, inter alia:

Now, therefore, upon the motion of this Court, it is hereby ORDERED that the petition herein is adjourned in contemplation of dismissal until July 15, 2011, upon the following terms and conditions with a view to ultimate dismissal of the petition in furtherance of justice:

ACD for 12 months on the following conditions:

1. The mother must comply with agency supervision.

2. The mother must ensure that the child will have all his special medical needs met, and that he attend all medical and well child care appointments.

3. The mother shall ensure that all the babysitters are cleared by ACS; and it is further ORDERED that during the period of adjournment, the child shall reside in the custody of the respondent mother; . . . and it is further ORDERED that, if the proceeding has not been restored to the calendar and if no application for restoration is pending as of the expiration date of this order and if this order has not been extended, the child protective agency shall report to the Court, the law guardian, the parties, their attorneys and the non-respondent parent on the status and circumstances of the child and family and any actions contemplated, if any, by the agency with respect to the child and family; and it is further ORDERED that, if the proceeding has not been restored to the calendar and if no application for restoration is pending as of the expiration date of this order and if this order has not been extended, the petition shall be deemed dismissed in furtherance of justice.

The July 15, 2011 order not having been extended or restored, the petition was deemed dismissed and JJ remained in the custody of Jacobs.

An Individualized Education Program (the "IEP")[2], by New York City Department of Education, indicating November 23, 2011, as a projected date to be implemented, and November 4, 2012, as a projected date of annual review, describes the present levels of JJ's performance and academic, developmental and functional individual needs.  The present levels of performance and individual needs are noted on the IEP.  In the area of JJ's academic achievement, functional performance and learning characteristics, he was assessed using the Student Annual Needs Determination Inventory as well as the Citywide Speech Services Speech

---

[2] The IEP, Exhibit C attached to the Attorney Affirmation, dated September 7, 2012, Docket Entry No. 119, consists of six unidentified pages and is incomplete because the last table on the last page of that document contains an incomplete sentence: "Within a year, Jacques will demonstrate increased sitting tolerance and balance to be able to engage in play or," suggesting that additional pages exist, but were not included.

and Language Checklist.  The following was noted, inter alia:

> Jacques is nonverbal and communicates using facial expressions and some gestures.
> He is learning to use AAC [Augmentative and Alternative Communication] systems
> to improve his communication skills.  He exhibits some hearing loss and therefore
> does not respond consistently to auditory cues in the environment.  He responds to
> visual and tactile cues and will track objects and people.  Jacques is better at
> attending to objects rather than people.  He is able to make requests and choices by
> reaching, seeks attention by reaching/touching an adult, rejects by pushing items
> away or turning his head, demonstrates cause and effect, and understands some
> single words.  He is learning to use a single cell voice output device to request in the
> classroom.  He is also working on developing feeding skills, such as self feeding
> with assistance and drinking from a cut out cup.  He is also able to manipulate some
> objects; however, he has coordination problems and needs support in order to
> complete more precise tasks.  He will follow simple commands with multiple
> prompts and is learning the concept of more.  He will attend to a book for a minute.
> Jacques is expected to reach all of his goals within one year; however, he acquires
> and retains information at a slow rate of speed.

With respect to JJ's social development, the IEP notes, inter alia:

> Jacques is friendly to both familiar caregivers and strangers.  He shows enthusiasm
> upon seeing familiar caregivers, especially his mother, and displays a certain level
> of anxiety when caregivers walk away from him or move out of his visual field.
> When not engaged with a tactile object, he will reach out to people near to him in
> order to grab onto something.  He does not initiate interactions with his peers and
> requires maximum assistance to participate in social games such as peek-a-boo and
> rolling a ball.  He displays a few emotions such as happy, content and sad. . . .
> Jacques is able to express his needs and wants by lifting his arms to indicate he wants
> to be picked up or by crying.  He will engage in an activity with another person for
> a brief period of time.

With respect to JJ's physical development, physical development needs and management needs,

the IEP notes:

> Jacques turns inconsistently to sounds, relying on visual cues to orient himself.  He
> communicates with via [sic] eye gaze and facial expression, with vocalization of
> vowel sounds and some babbling.  Jacques reaches for objects bilaterally and
> grasp[s] them, although he has difficulty coordinating movements.  He is able to
> remove objects from a container and stack rings on a cylinder with minimal
> assistance.  At home, mom reports that he is able to place puzzle piece[s] in allotted
> spaces but this has not been observed in school despite prompts/cues. Jacques loves
> to move around the mat by rolling over or wriggling around while in supine

(backlying). . . . Jacques requires a small, structured classroom with a high staff: student ration [sic]. He needs a multi-sensory environment with visual guides to aid him in responding . . . to his environment. He requires physical support to help him with his coordination. Jacques requires moderate to maximum assistance with all activities of daily living.

On April 12, 2012, Tomsky met with JJ and his mother at their attorney's office, and he

reports the following in his affidavit:

Jacques is a severely injured child. He cannot walk, talk or sit still. He has very limited understanding. He cannot go to the bathroom alone and cannot feed himself. He requires a pureed diet as well as three cans of Pediasure supplementation per day. He requires constant hands on supervision. . . . Since July 2010, Jacques has been residing with his mother, Equisha Jacobs [in the] Bronx, New York. . . . Jacques currently attends the school United Cerebral Palsy in the Bronx, New York. When Jacques is not in school, he is cared for by his mother, Equisha. She wakes Jacques up in the morning, prepares him breakfast and gets him ready for school. When Jacques gets home from school Equisha tends to Jacques' needs, prepares dinner for him and, at bed time, gets him ready for bed. At this time, Equisha is Jacques' sole caregiver. . . . While Equisha has every good intention and truly believes that she is trained to and will be able to care for Jacques, there is no doubt in my mind that she will not be able to do so. As Jacques gets older, bigger and heavier first as an adolescent and then as an adult, Equisha will not be able to lift Jacques to clean, dress and otherwise tend to his every need and will need help in the form of a home health aid or will have to place him in a custodial care setting. . . . Clearly, Jacques Jacobs has lost the enjoyment and quality of life that is typically enjoyed by children his age and will never have such a life. I have no doubt that Jacques Jacobs will be unable to live independently or work to support himself at any time during his life. His injuries will require constant supervision and assistance for his entire life. He will never be able to perform the activities of daily living, the 'basic self-care tasks', [such] as dressing and undressing, self-feeding, bowel and bladder management, ambulation with or without the use of an assistive device, functional transfers from one place to another, and personal hygiene and grooming. . . . He will never be able to perform the 'instrumental activities of daily living', [such] as taking medications as prescribed, performing housekeeping tasks, managing money, using the telephone or other form or communication, shopping for groceries and clothing, and managing transportation within the community.

On August 29, 2012, Dr. Andrew J. Klein ("Dr. Klein"), a pediatrician, reviewed JJ's

medial history and examined JJ. In his report, Dr. Klein noted that JJ had the gastronomy tube

replaced by pediatric surgery several times, but it "was removed two years ago and not

replaced." Dr. Klein noted that JJ had a bilateral myringatomy and tube placement at

approximately one year of age and again in July 2012 for bilateral serous otitis media.  JJ is

currently being fitted for hearing aids due to bilateral sensorineural hearing loss.  Dr. Klein

reported:

> Jacques has severe developmental delay.  He is hypotonic and hyperreflexic.  He can
> sit unsupported, but cannot stand alone.  He wears leg braces as part of his physical
> therapy.  He is severely delayed in fine motor skills and receives occupational
> therapy.  Jacques is nonverbal, he has no expressive language, minimal receptive
> language and he does not feed himself.  He currently receives both speech and
> feeding therapy. . . .   Impressions:
> Jacques Jacobs is a 6 ½ year old boy with multiple medical problems that are the
> result of severe hypoxic ischemic encephalopathy at birth.  He is severely
> neurologically and intellectually impaired, with severe global developmental delay
> and cerebral palsy.  He is growth retarded and has a sensorineural hearing loss.  All
> of these medical conditions are permanent and irreversible.  Jacques will require
> intense therapy to even reach his severely limited potential.  It is doubtful that he will
> ever achieve independent ambulation, or any expressive language.  For the rest of his
> life, Jacques will require constant care and supervision to perform even the most
> basic daily activities.

On August 24, 2012, Dr. Maudina Gumbs, JJ's treating physician at Montefiore

Comprehensive Health Care Center, wrote a letter, directed "To whom it may concern,"

informing that JJ "has cerebral palsy, severe intellectual impairment, seizure disorder, and

gastroesophageal disease.  He requires 24hr attention as he is nonverbal and immobile.  His

medical conditions are nonreversible."  The injuries JJ sustained resulting from the alleged

medical malpractice in this action include profound permanent neurological damage involving

spastic motor disability, brain injury, physical, mental and cognitive disabilities, developmental

delays and neurological impairment, cerebral palsy and mental retardation.

On September 11, 2012, the New York City Human Resources Administration,

Department of Social Services, Office of Legal Affairs Liens and Recovery Litigation Unit, sent

a letter to JJ's attorney concerning JJ, stating:

> This letter reconfirms our agreement pursuant to my letter of April 9, 2012 where the Department of Social Services agreed to settle the Medicaid lien originally asserted in the amount of $264,830.00, which represents causally related Medicaid paid for the benefit of your client from May 15, 2006 through April 26, 2012, against the $5,950,000.00. . . . settlement in the above referenced matter for the amount of $150,000.00 (One Hundred Fifty Thousand Dollars and No Cents).

### PROPOSED SETTLEMENT AGREEMENT

The proposed settlement agreement is in the form of a partially structured settlement, with the total cost to the defendants prior to the allocation to the MIF, as follows: $5,950,000.00 (five million nine hundred fifty thousand and 00/100 dollars). The defendants' payment obligations are as follows: (i) $4,750,000.00 (four million seven hundred fifty thousand and 00/100 dollars) by BLH; (ii) $500,000.00 (five hundred thousand and 00/100 dollars) by Villasenor; and (iii) $700,000.00 (seven hundred thousand and 00/100 dollars) by the United States of America. The parties agreed that 25% ($1,487,500.00) of the total settlement amount would be allocated to the MFI and 75% ($4,462,500.00) allocated to the non-MIF. Of the total settlement of $5,950,000.00, the sum of $5,831,000.00 (five million eight hundred thirty one thousand and 00/100 dollars), or 98%, is allocated to JJ's claim and the sum of $119,000.00 (one hundred nineteen thousand and 00/100 dollars), or 2%, is allocated to Jacobs's derivative claim for loss of services. The total proposed attorney's fees, to be allocated proportionally between the MIF portion and non-MIF portion of the settlement agreement and among the defendants as provided in the settlement agreement, are $741,098.54. The proposed disbursements, to be allocated in the same manner as the attorney's fees, are $39,014.61. Tomsky's proposed compensation, to be paid from the non-MFI portion of the settlement agreement, for his service as guardian ad litem is $33,425.00.

13

Tomsky explains that the initial proposed settlement of April 2010 did not include any structured portion; instead the entirety of the settlement was to be paid in cash to a trust to be administered by two trustees, Jacobs and the Bank of America.  Tomsky believes it was more appropriate to structure a portion of the settlement to provide a guaranteed stream of income to the infant's trust as part of a well-rounded financial plan for JJ.  He explains that a structured settlement will provide sufficient income to meet JJ's basic needs for his life time.  Accordingly, purchasing life annuities with a total cost of $1,000,000.00 (one million dollars) will provide JJ with a starting monthly income benefit of $3,000.00 (three thousand dollars), increasing 3% compounded annually and guaranteed for 25 years.  The life annuities will be purchased from: (1) First Symetra National Life Insurance Company of New York ("Symetra"); (2) Prudential Insurance Company of America ("Prudential"); and (3) The United States Life Insurance Company of the City of New York ("US Life"), to stay within the $500,000.00 limits of the Life Insurance Company Guaranty Corporation of New York, New York Insurance Law Article 77, which provides $500,000.00 protection to New York residents for life insurance policies and annuities issued by a life insurance company licensed in New York.

According to Tomsky, the initial settlement agreement, reached in April 2010, did not contemplate the applicability of the MIF.  As a result of the Court's February 22, 2012 order, finding the MIF applicable to this case, it was necessary for the parties to re-open settlement negotiations, during which the parties agreed that 25% of the total settlement amount would be allocated to the MIF, which will be responsible for all JJ's future medical expenses, which is in his best interest, leaving 75% of the total settlement amount to provide for his other needs. Tomsky states that, in light of the MFI's application and, "due to the requirement to repay the Department of Social Services from supplemental needs trust upon the infant's death for all

14

benefits paid during the infant's lifetime, it would be counterproductive to create a supplemental needs trust at this time." Instead, Tomsky contends, it would be appropriate for the Court to approve the creation of non-supplemental needs trust to hold JJ's assets. Upon review of the proposed trust, Tomsky recommends that it be approved by the Court. According to him, the trust was drafted in such a way that all medical bills and related expenses must be requested from the MIF before any payment can be made from the trust, and no modifications to JJ's residence or to a vehicle can be made from the trust without first applying to the MIF, which is responsible for paying such items. Moreover, if the MIF denies expenditures, no payment from the trust can be made without a court order.

Tomsky recommends that the trustee of the trust be the Hudson Valley Bank because he worked with it on many occasions and found it to be very responsive to the needs of parents of brain injured children whose trusts are of the size contemplated in this settlement proposal. Tomsky maintains that larger banks have proven to be less interested and less responsive to the needs of children with smaller trusts, especially where a significant portion of the settlement funds is structured.

The following is proposed for the structured portion of the settlement agreement for which only BLH is responsible: (a) $342,157.73 to purchase an annuity from Symetra; (b) $347,377.27 to purchase an annuity from Prudential; and (c) $310,465.00 to purchase an annuity from US Life. The proposed structured portion of the settlement provides that the obligation of BLH may be met by assigning to and arranging for an assumption by Symetra Assigned Benefits Service Company ("Symetra ABSC" or "assignee") of BLH's obligation to make future periodic payments pursuant to Internal Revenue Code § 130(c), and that Symetra ABSC may fund the obligation assumed by the purchase of an annuity from Symetra, an A rated insurer licensed to

do business in New York.  The trust shall have a security interest in the annuity and Symetra shall guarantee the performance of Symetra ABSC.

The proposed structured portion of the settlement agreement also provides that the obligation of BLH may be met by assigning and arranging for an assumption by Prudential Assigned Settlement Services Corporation ("Prudential ASSC" or "assignee") of BLH's obligation to make future periodic payments pursuant to Internal Revenue Code § 130(c), and that Prudential ASSC may fund the obligation assumed by the purchase of an annuity from Prudential, an A+ rated insurer licensed to do business in New York.  The trust shall have a security interest in the annuity and Prudential shall guarantee the performance of Prudential ASSC.

Similarly, the proposed structured portion of the settlement agreement provides that the obligation of BLH may be met by assigning and arranging for an assumption by American General Annuity Service Corporation ("AGASC" or "assignee") of BLH's obligation to make future periodic payments pursuant to Internal Revenue Code § 130(c), and that AGASC may fund the obligation assumed by the purchase of an annuity from US Life, an A rated insurer licensed to do business in New York.  The trust shall have a security interest in the annuity and US Life shall guarantee the performance of AGASC.

BLH shall fund its obligations by issuing a check or draft made payable to: (a) Symetra ABSC, in the amount of $342,157.73; (b) Prudential ASSC, in the amount of $347,377.27; and (c) US Life, in the amount of $310,465.00, and delivering those checks or drafts to Kipnes Crowley Group LLC, one of the structured settlement brokers placing the case with the three insurers.  To effectuate the structured portion of the settlement agreement, the following future periodic payments by the assignees under the terms set forth in the trust are proposed:

16

    (A) Beginning 10/1/2012, $1,489.16 monthly, guaranteed for 228 months, increasing at a rate of 3% compounded annually.  (cost of annuity: $342,157.73)
    (B) Beginning 10/1/2012, $1,489.16 monthly, guaranteed for 228 months, increasing at a rate of 3% compounded annually.  (cost of annuity: $347,377.27)
    (C) Beginning 10/1/2031, $5,222.52 monthly for life, guaranteed for 72 months, increasing at a rate of 3% compounded annually (cost of annuity: $310,465.00)

The obligations assumed by the assignees to make periodic payments shall be discharged by mailing of a valid check or electronic funds transfer in the designated amount on or before the due date to the last address on record for the trust payee, or, in the event of JJ's death, to the beneficiary of the structured settlement payments.

Tomsky also recommends that Jacobs move for her appointment as JJ's legal guardian pursuant to Article 81 of the New York Mental Hygiene Law, since JJ will never be able to make legal, medical or financial decisions for himself and decisions made for him should be under the supervision of a court of competent jurisdiction.

With respect to the attorney's fees request, Tomsky believes that the law firm "should be paid its legal fee and reimbursed [for] its disbursements pursuant to the Retainer Agreement executed by Equisha Jacobs," because "the shortcomings of the papers submitted on the original motion to approve the settlement have been rectified."  Tomsky explains that the law firm representing the plaintiffs agreed to continue to act as counsel for Jacobs and JJ with regard to trust and guardianship issues for ten years free of charge, and it agreed to pay Sangerman's fee for drafting the proposed trust.  Tomsky believes that the law firm's disbursements are justified for the proper prosecution of this action and the attorney's fees are proper for the work performed and results achieved.  Tomsky describes the proposed distribution of the settlement agreement funds as follows:

17

| | |
|---|---|
| non fund's share | 4,462,500.00[3] |
| non fund's percentage | 0.75 |
| non fund's share of disbursements | 29,260.96 |
| non fund's balance | 4,433,239.04 |
| non fund's [attorney's] fee | 555,823.90 |
| non fund's share | 3,877,415.14 |
| | |
| fund's share | 1,487,500.00 |
| fund's percentage | 0.25 |
| fund's share of disbursements | 9,753.65 |
| fund's balance | 1,477,746.35 |
| fund's share of [attorney's] fee | 185,274.63 |
| fund's share | 1,292,471.71 |
| | |
| infant's share of Non Fund | 4,343,500.00 |
| infant's percentage of non fund | 0.9733 |
| infant's disbursements | 28,480.67 |
| infant's balance | 4,315.019.33 |
| infant's share of [attorney's] fee | 541,011.93 |
| infant's net share | 3,774,017.40 |
| Lien of [Department of Social Services] | 150,000.00 |
| infant's net | 3,624,017.40 |
| Annuities | 1,000,000.00 |
| Payable to Trust | 2,624,017.40 |
| | |
| Equisha's share of non fund | 119,000.00 |
| Equisha's percentage of non fund (2% of gross) | 0.0267 |
| Equisha's share of disbursements | 780.29 |
| Balance | 118,219.71 |
| Equisha's Share of [attorney's] Fee | 14,821.97 |
| Payment to Equisha | 103,397.74 |

Tomsky asks that the Court approve the proposed settlement agreement and the trust and that the

following payments be made of the sums remaining after the 25% MIF allocation:

BLH shall pay the total of $3,718,104.83, as follows:

    $443,714.22   (79.83% of the Non-Fund Fee) to Silberstein, Awad & Miklos, P.C.
     $23,359.02   (79.83% of the Non-Fund Disbursements) to Silberstein, Awad & Miklos,
                  P.C.

---

[3] The numbers in this column reflect the amounts in U.S. dollars.

|  |  |
|---|---|
| $147,904.74 | (79.83% of the Fund Attorneys Fees) to Silberstein, Awad & Miklos, P.C. |
| $7,786.34 | (79.83% of the Fund Disbursements) to Silberstein, Awad & Miklos, P.C. |
| $150,000.00 | to New York City Department of Social Services in full satisfaction of its lien |
| $342,157.73 | to Symetra [ABSC] for purchase of structured settlement annuity |
| $347,377.27 | to Prudential [ASSC] for purchase of structured settlement annuity |
| $310,465.00 | to the US [Life] for purchase of structured settlement annuity |
| $103,397.74 | to Equisha Jacobs as her net recovery after [the] payment of her pro-rata share (2%) of attorneys' fees and disbursements |
| $ [33,425.00] | to John M. Tomsky, Esq., as and for his fee as Guardian Ad Litem |
| $1,841,942.77 | (less fee of Guardian Ad Litem) to The Jacques Jacobs Trust. |

The United States of America shall pay the total of $548,191.08, as follows:

|  |  |
|---|---|
| $65,420.47 | (11.77% of the Non-Fund Fee) to Silberstein, Awad & Miklos, P.C. |
| $3,444.02 | (11.77% of the Non-Fund Disbursements) to Silberstein, Awad & Miklos, P.C. |
| $21,806.82 | (11.77% of the Fund Attorneys Fees) to Silberstein, Awad & Miklos, P.C. |
| $1,148.01 | (11.77% of the Fund Disbursements) to Silberstein, Awad & Miklos, P.C. |
| $456,371.76 | (11.77% of Non-Fund damages to The Jacques Jacobs Trust) |

Villasenor shall pay the total of $391,232.37, as follows:

|  |  |
|---|---|
| $46,689.21 | (8.40% of the Non-Fund Fee) to Silberstein, Awad & Miklos, P.C. |
| $2,457.92 | (8.40% of the Non-Fund Disbursements) to Silberstein, Awad & Miklos, P.C. |
| $15,563.07 | (8.40% of the Fund Attorneys Fees) to Silberstein, Awad & Miklos, P.C. |
| $819.30 | (8.40% of the Fund Disbursements) to Silberstein, Awad & Miklos, P.C. |
| $325,702.87 | (8.40% of the net Non-Fund damages) to Silberstein, Awad & Miklos, P.C. |

The settlement agreement provides that the plaintiffs make an application for JJ's enrollment in the MIF "within 45 days of the entry of the Infant Compromise Order in the form as attached to this Settlement Agreement as Exhibit 'B.'" No obligation shall be incurred by the defendants to make any payment beyond their portion of the settlement agreement and the plaintiffs shall not make a claim or commence an action to recover any portion of the MIF allocation from the defendants, their insurers or a non-party released by the settlement agreement. The plaintiffs shall release and hold harmless the defendants, their insurers and any

non-party released from any claim or lawsuit brought by any party with an attempt to recover

any sums related to the events on which this action is based.  The settlement agreement is

contingent on its approval by the Court and the entry of the infant compromise order approving

the settlement on behalf of JJ.  Furthermore, the settlement agreement is conditioned upon the

plaintiffs' counsel providing to the defendants' counsel the following closing documents: (1) a

duly executed infant compromise order approving the settlement; (2) an executed general release

with joint tortfeasor language; (3) a stipulation of discontinuance with prejudice discontinuing

the infant's claims and the derivative claim for loss of services by Jacobs; (4) a completed W-9

form from the plaintiffs' counsel containing their tax identification numbers; (5) a hold harmless

agreement; and (6) the dismissal with prejudice of the appeal currently proceeding under docket

number 12-1294 in the United States Court of Appeals for the Second Circuit.[4]  Moreover, "all

settlement documents need to be signed by Equisha Jacobs, individually, and John M. Tomsky

as Guardian Ad Litem for Jacques Jacobs and Silberstein, Awad & Miklos for the Plaintiff and

Douglas Kaplan for the plaintiff and Appellant, Equisha Jacobs."  The settlement agreement also

stipulates that, except for the United States of America, the defendants and their insurers shall

take steps necessary to comply with the payment provision of CPLR § 5003-a.  Regarding the

United States of America, its payment is subject to the availability of sufficient funds in the

special account for community health center settlements and judgments to pay the entire amount

due at one time, pursuant to 42 U.S.C. § 233(k).  The plaintiffs and their attorneys represent that

---

[4] Although the proposed settlement agreement, dated October 1, 2012, states that the appeal under docket number 12-1294 is "currently proceeding," the appeal, Docket Number 12-1924, was dismissed on June 28, 2012, Docket Entry No. 114, when the Second Circuit issued its mandate dismissing the case after determining it was deemed in default for failure of the appellant to comply with the docketing requirements.

no liens exist, other than a Medicaid lien mentioned above, which was compromised to

$150,000.00, and no attorneys' liens against or arising out of the settlement proceeds exist.

***Tomsky's Affidavit of Services of Guardian Ad Litem***

In support of the motion, Tomsky submitted his Affidavit of Services of Guardian Ad

Litem.  Tomsky graduated from the University of Miami School of Law in 1977.  He stated that

he is an attorney at law and counsel to the firm of Sullivan Papain Block McGrath & Cannavo,

P.C., located in New York, New York.  He has been associated with the law firm as an associate

from 1980 to 1989, as a partner from 1989 to 2002, and as counsel to the firm since 2002.

Tomsky has over thirty years of experience as a lawyer in the field of personal injury litigation,

including medical malpractice and cases involving children suffering neurological injuries as a

result of medical malpractice, and has been involved in the investigation, prosecution,

settlement, verdicts and appeals of such cases.  Tomsky is a frequent lecturer for the New York

State Bar Association, the New York State Trial Lawyers Association and St. John's University

on the subject of Surrogate's Court practice for trial lawyers, elder care issues for trial lawyers,

lien resolution, including Medicare, Medicaid, and private insurer subrogation and wrongful

death and infant compromise matters.

Tomsky stated he has no interest in the instant action adverse to the interest of his ward

JJ, and he is not connected in any way or in any business with the attorneys for the parties or the

parties to this action.  Tomsky requests that the order approving the settlement fix and allow the

fair and reasonable value of the services rendered by him as JJ's guardian ad litem.  Tomsky

submitted his time records showing that he "devoted more than 106.50 hours of time, including

9 hours which were spent in court," at the August 2, 2012 hearing, as well as the time meeting

with his ward, examining records and talking with his counsel, negotiating the settlement,

arranging for the structured settlement, arranging for the Jacques Jacobs Trust and preparing, "service and filing of the motion to settle the action." Tomsky states that in the matters where he acts as a guardian ad litem, his customary fee is $350.00 per hour. Notwithstanding Tomsky's statement that he "devoted more than 106.50 hours of time" to this case and that his billing table, contained in his affidavit, shows his total number of hours as "106:30," he seeks $33,425.00 for his services as JJ's guardian ad litem.

### *Attorney's Affirmation*

<u>CPLR § 1208(b)(1) Attorney's Reasons for Recommending the Settlement</u>

Awad states in his affirmation that he reviewed Tomsky's affirmation, "which was drafted, written and finalized by Mr. Tomsky," and he supports Tomsky's position regarding the settlement of this action. Awad endorses the settlement agreement, the distribution of the settlement agreement funds and the application of the MIF because it is a fair resolution to this action without a jury trial, given contested question of liability, and it reflects Tomsky's and Jacobs's values and considerations regarding the management and investment of the settlement proceeds. The settlement agreement also provides for a safe and secure investment of the money via the use of a trust agreement, as a management tool, the selection of a financial institution, as a trustee to provide overall financial management and to address JJ's future custodial care costs. According to Awad, proceeding to a trial presents the potential for an increased amount of recovered money, but also the risk of a defense verdict and no recovery for JJ. Awad states that his recommendation of the proposed settlement agreement is also based on his law firm's experience representing infants, over the past twenty years, in more than seventy matters involving this type of obstetrical medical malpractice, including Awad's specific experience in the obstetrical malpractice arena gained: (1) as president of the New York State Trial Lawyers

22

Association; (2) through service on the New York State Medical Malpractice Task Force; and (3) as chair, for over five years, of the Medical Malpractice Committee of the New York State Trial Lawyers Association.  Awad explains that his settlement agreement recommendation results from an analysis of the underlying facts relating to the contentions of medical negligence and his law firm's evaluation of the profound consequences suffered by JJ.  To aid the Court in understanding the reasons for his recommendation of the settlement agreement, Awad explains the background of the case.

Awad describes the circumstances related to the plaintiffs' contention of medical negligence based on the theory that the defendants departed from accepted obstetrical practice in managing Jacobs's labor and delivery, by not treating her labor as high risk and by failing to manage her labor adequately and timely.  More specifically, the defendants did not employ an electronic fetal heart monitor and did not have an attending obstetrician assess the progress of Jacobs's labor periodically.  According to Awad, the failure to deliver JJ by caesarian section, before midnight, resulted in fetal bradycardia and its consequences.  Awad explains that the defense of the case was predicated upon "a classic proximate cause defense that an unpredictable event occurred" and that Jacobs's labor was not managed adequately.  Additionally, the plaintiffs alleged that the BLH physicians failed timely to: (i) rupture Jacobs's membranes and apply internal fetal electrodes; and (ii) evaluate properly the information provided by electronic fetal heart monitoring.  Moreover, allegations were also made respecting the resuscitation, intubation and management of JJ's respiratory and pulmonary functions immediately following his birth and during the first three hours of his life.

Awad contends that the medical evidence regarding the effect of the fetal bradycardia on JJ was disputed in the defendants' answers and during discovery.  He maintains that the defense

of the case was predicated on the guidelines published by the American College of Obstetricans and Gynaecologists, including those regarding the evaluation of beat-to-beat long term variability, which provide that, as long as a beat-to-beat variability of 6 or greater exists for any particular period of time, that beat-to-beat variability is just as healthy as if a fetal heart rate of 25 beat-to-beat variability is achieved over the same time period.  Moreover, the medical defense also consisted of the assertion that, since the mother's membranes had not ruptured at the time of admission, and no pattern of late decelerations was presented by the external monitoring that would foreshadow the possible danger of unrelieved fetal bradycardia, it was not foreseeable that anything serious would occur.  Additionally, the defense asserted that once fetal bradycardia presented, the hospital team detected it and responded properly and adequately, as the nurses surrendered care to resident physicians, who in turn contacted attending fellows and board certified obstetricians, who directed that an emergency caesarian section be performed within 30 minutes of being alerted to the emergency.

The plaintiffs contend that a blood gas analysis showed profound hypoxic ischemic injury to JJ from the bradycardia, and that JJ's clinical presentation today is a classic cerebral palsy caused by hypoxic ischemia during labor and delivery.  Awad explains that multiple defense theories about causation also included one about an aberrant blood gas analysis that was supposedly obtained by obstetrics, independent of the NICU, which showed that JJ had neither suffered a loss of oxygen during the period of bradycardia nor experienced metabolic acidosis. The plaintiffs relied on the blood gas analysis obtained by a nurse pediatric practitioner and her clinical notes recorded in the NICU, which showed a depressed baby at birth.  According to Awad, "[t]his particular medical defense is predicated on a confusion in the medical and hospital charts of mother and child as to the effects of the fetal bradycardia as reported in the mothers

24

[sic] record in comparison to the baby's record." Awad contends that each of the defenses could be attractive to a jury.

### CPLR § 1208(b)(2) Attorney's Interest and Representation

Awad states that he does not represent any other persons asserting a claim arising from this action and he has not, directly or indirectly, become concerned in the settlement at the instance of a party opposing, or with interests adverse to the infant, nor has he received or will receive any compensation from such a party. Awad states he did not represent, and he does not represent any other person regarding Jacobs's derivative cause of action. Awad requests that Jacobs be allocated $119,000.00 in satisfaction of her viable derivative loss of services claim, which is 2% of the total gross recovery of the settlement. Moreover, Jacobs withdrew her appeal, as demonstrated by the affirmation of Douglas Kaplan, Esq. In addition, Awad recommends the proposed settlement agreement because it includes a fair compromise with the Department of Social Services respecting the Medicaid lien.

### CPLR § 1208(b)(3) Attorney's Services Rendered

With respect to the services rendered by his law firm, Awad explains that he is a senior partner of the firm and managed the case. He was assisted by several associate trial attorneys including Robert Miklos and Jason Kaufer. Awad started his investigation of the claims by meeting with Jacobs, on February 10, 2006, when she signed the retainer agreement with his law firm. The retainer agreement provides that the law firm will be paid: (a) 30% of the first $250,000 of the sum recovered; (b) 25% of the next $250,000 of the sum recovered; (c) 20% of the next $500,000 of the sum recovered; (d) 15% of the next $250,000 of the sum recovered; and (e) 10% of any amount over $1,250,000 of the sum recovered. The retainer agreement provides that the percentages "shall be computed on the net sum recovered after deducting from the

amount recovered expenses and disbursements for expert testimony and investigative or other services properly chargeable to the enforcement of the claim or prosecution of the action." Awad explains that he received JJ's hospital records in November 2006, after JJ was discharged, which were read and analyzed by him and his associate trial attorney Jennifer Spina.  An in-house medical review was completed and an expert obstetrician's review was requested.  Awad spent one month reviewing approximately 5,000 pages of hospital and medical records.  The obstetrical review generated opinions of departures and causation and the obstetrician advised that an analysis of Jacobs' prenatal records be undertaken, which revealed a meritorious case against the federal clinic for deficient prenatal care.  Consultations were obtained with other obstetricians and specialists in maternal fetal medicine, neonatology, pediatric neurology, neuro-radiology, placenta pathology, physical rehabilitation and vocational medicine.  Awad read numerous medical articles in preparation for each conference with medical experts.

A complaint was filed in the state Supreme Court on or about July 8, 2008, and, thereafter, the necessary claim documents were filed in connection with the Federal Tort Claims Act.  This action commenced on September 18, 2008, and in September 2009, the two actions were consolidated.  Awad explained that his firm has a protocol requiring "that an associate trial attorney precede [him] or shadow [him] in all legal representations, which is what Jennifer Spina, Robert Miklos and Jason Kaufer did.  According to Awad,

> [e]very legal document received by our office from the defendants underwent the same examination: once recorded, logged and reviewed by a senior paralegal, the document was then delivered to a trial associate who then formulated a response and analyze [sic] its impact on the case.  I was selectively involved in that process because legal documents required my final review.

Discovery conducted by Awad and his law firm consisted of depositions of defendant witnesses, interrogatories and document requests as well as expert medical consultations, the retention of medical experts, and coordinating the opinions from experts in different fields.  Moreover, services of a board-certified life care planner, physical rehabilitation physician and an economist were retained.  In April, 2010, the parties agreed to settle the action.

Awad contends that the retainer agreement, executed by Jacobs, and the retainer agreement executed by Tomsky, on May 30, 2012, as guardian ad litem for JJ provide that the attorney's fee be set pursuant to New York Judiciary Law ("JL") § 474-a, "customarily known as the 'sliding scale.'"  He explains that pursuant to the Federal Tort Claims Act, an attorney's contingency fee in a medical negligence action cannot exceed 25%, so the calculation of the attorney's fee was done pursuant to state law, because it ensures that JJ "is charged a contingency fee less than the maximum contingency fee permitted under the Federal Tort Claims Act."  Awad contends that the fee requested in this action "is approximately 12.6% of the overall recovery value of" the settlement amount.

Awad submitted as Exhibit M to his affirmation dated June 8, 2012, Docket Entry No. 112, "contemporaneous time records in the form of a time line list generated by our office's case management program, TimeMatters."  According to Awad, "New York State Courts do not require that contemporaneous records of work performed be made when agreeing to serve as a legal representative pursuant to Section 474-a contingency fee retainer approved by the Appellate Division of the State Courts."  Exhibit M covers the period from February 10, 2006, to May 30, 2012.  Awad also submitted as Exhibit N to his affirmation dated June 8, 2012, Docket Entry No. 112, "a key to identify the initials listed on the time line."

Awad provided examples of the customary fees received by law firms in the state courts,

pursuant to JL § 474-a in obstetrical malpractice cases involving a neurologically impaired infant: (a) $751,905.14, in a $6.1 million case; (b) $738,725.61, in a $5.9 million case; (c) $908,663.66, in a $7.6 million case; and (d) $747,227.39, in a $6 million case.  According to Awad, the fees requested by his firm are reasonable.  Moreover, his law firm will remain available as counsel to JJ or his appointed guardian for the next ten years, without charge, and "the legal fees charged by attorney Jay Sangerman for the creation of the trust and other legal matters will be paid directly by our firm to Mr. Sangerman from our firm's legal fee without charge to the trust or the infant."  Awad contends that state law should determine the contingency fee in this action and that the state law respecting attorney's fees is applied routinely by federal courts in cases involving injured infants "because the law of attorney's fees is considered substantive."  Awad seeks attorney's fees of $741,098.54.

Awad also seeks $39,014.16 in disbursements, for the period from November 7, 2006, to July 7, 2011.  In support of his request for disbursements, Awad submitted as Exhibit O to his affirmation dated June 8, 2012, Docket Entry No. 112, "a computer generated spread sheet of all disbursements made" and "[i]nvoices, bills, checks and receipts for these disbursements."

## DISCUSSION

### Legal Standard

> An action by or on behalf of an infant . . . shall not be settled or compromised, or voluntarily discontinued, dismissed or terminated, without leave of the Court embodied in an order, judgment or decree.  The proceeding upon an application to settle or compromise such an action shall conform, as nearly as may be, to the New York State statutes and rules, but the Court, for cause shown, may dispense with any New York State requirement. . . . The Court shall authorize payment to counsel for the infant . . . of a reasonable attorney's fee and proper disbursements from the amount recovered in such an action, whether realized by settlement, execution or otherwise and shall determine the said fee and disbursements, after due inquiry as to all charges against the fund. . . . The Court shall order the balance of the proceeds

28

of the recovery or settlement to be distributed as it deems may best protect
the interest of the infant. . . .

Local Civil Rule 83.2.

Approving the compromise of an infant's claim, pursuant to Local Civil Rule 83.2, is left to the

court's discretion.  See Neilson v. Colgate-Palmolive Co., 199 F.3d 642, 654 (2d Cir. 1999).  "In

exercising its discretion, the district court's focus is to determine whether a proposed settlement

is fair, reasonable, and adequate, by comparing the terms of the compromise with the likely

rewards of litigation."  Id. (quotation marks, alteration and citation omitted).  Courts have used

various factors in determining whether to approve a settlement, for example, in the context of

class action settlements:

> (i) the settlement is not collusive but was reached after arm's length negotiation; (ii)
> the proponents have counsel experienced in similar cases; [and] (iii) there has been
> sufficient discovery to enable counsel to act intelligently . . . .  The adequacy of any
> settlement can only be determined by holding it up against "the strength of the
> Plaintiffs' case."

> Ross v. A.H. Robins Co., 700 F. Supp. 682, 683-84 (S.D.N.Y. 1988) (citation omitted).

New York law provides, in pertinent part, that "[u]pon motion of a . . . guardian ad litem

of an infant . . . the court may order settlement of any action commenced by or on behalf of the

infant. . . . An order on such a motion shall have the effect of a judgment.  Such an order . . .

shall be entered without costs and shall approve the fee for the infant's . . . attorney, if any."

CPLR §1207.  New York's settlement procedure provides:

> (a) Affidavit of infant's . . . representative.  An affidavit of the infant's . . .
> representative shall be included in the supporting papers and shall state:

> 1.  his name, residence and relationship to the infant . . . ;
> 2.  the name, age and residence of the infant . . . ;
> 3.  the circumstances giving rise to the action or claim;
> 4.  the nature and extent of the damages sustained by the infant . . . , and if the action
> or claim is for damages for personal injuries to the infant . . . , the name of each

29

physician who attended or treated the infant . . . or who was consulted, the medical expenses, the period of disability, the amount of wages lost, and the present physical condition of the infant . . . .

5.  the terms and proposed distribution of the settlement and his approval of both;

6.  the facts surrounding any other motion or petition for settlement of the same claim, of an action to recover on the same claim or of the same action;

7.  whether reimbursement for medical or other expenses has been received from any source; and

8.  whether the infant's . . . representative or any member of the infant's . . . family has made a claim for damages alleged to have been suffered as a result of the same occurrence giving rise to the infant's . . . claim and, if so, the amount paid or to be paid in settlement of such claim or if such claim has not been settled the reasons therefor.

(b)  Affidavit of attorney.  If the infant or his representative is represented by an attorney, an affidavit of the attorney shall be included in the supporting papers and shall state:

1.  his reasons for recommending the settlement;

2.  that directly or indirectly he has neither become concerned in the settlement at the instance of a party or person opposing, or with interests adverse to, the infant . . . nor received nor will receive any compensation from such party, and whether or not he has represented or now represents any other person asserting a claim arising from the same occurrence; and

3.  the services rendered by him.

(c)  Medical or hospital report.  If the action or claim is for damages for personal injuries to the infant . . . , one or more medical or hospital reports, which need not be verified, shall be included in the supporting papers.

(d)  Appearance before court.  On the hearing, the moving party or petitioner, the infant . . . , and his attorney shall attend before the court unless attendance is excused for good cause.

(e)  Representation.  No attorney having or representing any interest conflicting with that of an infant . . . may represent the infant . . . .

CPLR § 1208.

[S]ettlements or judgments governed by the Fund require that damages be allocated between Fund damages (future medical expenses) and non-Fund damages (damages other than future medical expenses).  This allocation determines how much lump sum cash the plaintiff receives and how much an insurer or self-insured medical provider saves because of the Fund's obligation to assume the future medical expense component of the award.

<u>Mendez v. New York & Presbyterian Hosp.</u>, 34 Misc.3d 735, 742, 934 N.Y.S.2d 662, 667 (Sup. Ct. Bronx Cty. 2011).

"The purpose of the fund is to provide a funding source for future health care costs associated with birth related neurological injuries, in order to reduce premium costs for medical malpractice insurance coverage."  PHL § 2999-g.

> "Birth-related neurological injury" means an injury to the brain or spinal cord of a live infant caused by the deprivation of oxygen or mechanical injury occurring in the course of labor, delivery or resuscitation or by other medical services provided or not provided during delivery admission that rendered the infant with a permanent and substantial motor impairment or with a developmental disability as that term is defined by section 1.03 of the mental hygiene law, or both.  This definition shall apply to live births only.

> PHL § 2999-h.

"The fund shall be used to pay the qualifying health care costs of qualified plaintiffs."  PHL § 2999-j.  "Qualified plaintiff means every plaintiff or claimant who . . . has sustained a birth-related neurological injury as the result of alleged medical malpractice and has settled his or her lawsuit or claim therefor."  New York Compilation of Code, Rules and Regulations ("CCRR"), tit. 10, § 69-10.1(y)(2).

> Every settlement agreement for claims arising out of a plaintiff's or claimant's birth related neurological injury subject to this title, and that provides for the payment of future medical expenses for the plaintiff or claimant, shall provide that in the event the administrator of the fund determines that the plaintiff or claimant is a qualified plaintiff, all payments for future medical expenses shall be paid in accordance with this title, in lieu of that portion of the settlement agreement that provides for payment of such expenses. The plaintiff's or claimant's future medical expenses shall be paid in accordance with this title.  When such a settlement agreement does not so provide, the court shall direct the modification of the agreement to include such term as a condition of court approval.

> PHL § 2999-j(6)(a).

31

The determination of the qualified plaintiff's attorney's fee shall be based upon the entire sum awarded by the jury or the court or the full sum of the settlement, as the case may be.  The qualified plaintiff's attorney's fee shall be paid in a lump sum by the defendants and their insurers pursuant to section four hundred seventy-four-a of the judiciary law; provided however that the portion of the attorney fee that is allocated to the non-fund elements of damages shall be deducted from the non-fund portion of the award in a proportional manner.

PHL § 2999-j(14).

"Under the statute, defendant pays that portion of the fee allocable to Fund damages and plaintiff is responsible for the remainder."  <u>Mendez</u>, 34 Misc.3d at 738, 934 N.Y.S.2d at 664.[5]

New York law provides that a contingent fee for attorney in an action for medical malpractice shall not exceed:

30 percent of the first $250,000 of the sum recovered;
25 percent of the next $250,000 of the sum recovered;
20 percent of the next $500,000 of the sum recovered;
15 percent of the next $250,000 of the sum recovered;
10 percent of any amount over $1,250,000 of the sum recovered.

JL § 474-a(2).

"[T]he section 474-a(2) scheduled fees are presumptively reasonable in all malpractice cases."  <u>Yalango v. Popp</u>, 84 N.Y.2d 601, 607, 620 N.Y.S.2d 762, 766 (1994).  Federal Tort Claims Act procedure provides that "[n]o attorney shall charge, demand, receive, or collect for services rendered, fees in excess of 25 per centum of any . . .  settlement made pursuant to section 2677[6] of this title."  28 U.S.C. § 2678.

---

[5]  Although the statute, including the provision concerning the attorney's fees, PHL § 2999-j(14), does not speak explicitly about the portion of the attorney's fees allocated to the fund element of damages, it can be inferred, as the <u>Mendez</u> court did, that the fund portion of the award is contemplated to be paid, not saved by the defendants.

[6]  "The Attorney General or his designee may arbitrate, compromise, or settle any claim cognizable under section 1346(b) of this title, after the commencement of an action thereon."

A court may allow a guardian ad litem a reasonable compensation for his services to be paid in whole or part by any other party or from any recovery had on behalf of the person whom such guardian represents or from such person's other property. No order allowing compensation shall be made except on an affidavit of the guardian or his attorney showing the services rendered.

CPLR § 1204.

***Application of Legal Standard***

<u>Compliance with New York Law</u>

The Court is satisfied that Tomsky, the guardian ad litem for JJ, and his attorney, on this motion made pursuant to Local Civil Rule 83.2, and in accordance with CPLR § 1207, complied with the infant settlement procedural requirements, codified in CPLR § 1208. Tomsky's affidavit states what is required by CPLR § 1208(a), including the terms and proposed distribution of the settlement agreement proceeds and his approval of both. Awad's affirmation states what is required by CPLR § 1208(b), including his reasons for recommending the settlement. Based on the submissions on the instant motion, as well as the record in this case, including the infant compromise hearings conducted on July 19, 2011, and August 2, 2012, the Court finds that, for the purposes of the settlement of this action, JJ is deemed to have sustained a birth-related neurological injury as a result of the alleged medical malpractice of the defendants.

---

28 U.S.C. § 2677. Section 1346(b) of Title 28 of the United States Code provides that:
   the district courts . . . shall have exclusive jurisdiction of civil actions on claims against the United States, for money damages . . . for injury or loss of property, or personal injury . . . caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under  circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.
   28 U.S.C. § 1346(b)(1).

<u>Whether Settlement Is in the Best Interest of the Infant</u>

The Court is intimately familiar with the facts and circumstances, the record and the procedural history of this action, and has worked closely with the parties over a long period of time to ensure that the settlement agreement reached in this action is in the best interest of JJ.  In determining whether the settlement is in the best interest of JJ, the Court was mindful of the long history of this action and considered carefully the entire record, including the infant compromise hearings, conducted on July 19, 2011, and August 2, 2012, as well as the submissions on the instant motion.  The settlement agreement in this action was reached after extensive arm's length negotiations by the parties and after discovery closed, on June 11, 2010.  As Awad explained, numerous depositions were taken and reviewed, as well as thousands of pages of documents, and one-on-one negotiations occurred before the parties agreed to the terms of the settlement.  Awad is an attorney with over twenty years of experience involving obstetrical medical malpractice actions, similar to this one.  Given that discovery closed on June 11, 2010, counsel had sufficient time to consider the issues and defenses in this action which enabled them to act intelligently in negotiating the terms of the settlement.  The case appears to involve complex issues related to liability requiring expert testimony in various sub-specialties.  The litigation, commenced in 2008, has been long and expensive, based on the amount of discovery produced and the work invested in pursuing negotiations and an agreement to settle.  The settlement amount appears to be reasonable, fair and adequate, in light of the litigation risks related to both liability and damages posed by the defense theories, proffered by the defendants during the pretrial discovery phase of the litigation.

The parties' agreement that 25% of the settlement amount be allocated to the Fund appears to be fair, reasonable and adequate and in harmony with the purpose of the MIF, which

is "to provide a funding source for future health care costs associated with birth related neurological injuries, in order to reduce premium costs for medical malpractice insurance coverage." PHL § 2999-g. The 25% allocation to the Fund reflects a fair, reasonable and adequate reduction in the settlement amount for the defendants, leaving a reasonable, fair and adequate amount in the non-Fund portion of the settlement fund to provide for the infant's needs not covered by the Fund.

The decision to create a trust in connection with the non-Fund portion of the settlement and to structure part of the non-Fund portion of the settlement by allocating $1,000,000.00 to purchase annuities is fair and reasonable because it will provide a guaranteed and fixed income to JJ's trust during his lifetime. After careful review, the Court finds that JJ's trust is drafted in a fair, reasonable and adequate manner, addressing all anticipated needs for JJ's care that may not be covered by the Fund. Hudson Valley Bank, N.A., the corporate trustee selected to manage the trust, appears to be a fair and reasonable choice, given its experience with the type and size of the trust, and Tomsky's assessment of its ability to manage the trust and protect JJ's interests is satisfactory. The trust has been drafted by an experienced attorney, who considered carefully various future contingencies, leaving enough flexibility for the trustee to act as necessary to provide for JJ's future needs and to protect JJ's interests.

The Court finds that $119,000.00, the amount of the settlement agreement allocated to Jacobs's claim for loss of services, is fair, reasonable and adequate because it represents a small fraction, 2%, of the gross settlement for her viable claim. The Court finds that the total amount of the settlement agreement, $5,950,000.00 and the proposed distribution among the defendants, allocating 25% to the MIF, and 75% to the non-MIF, out of which $119,000.00 is allocated to Jacobs for her loss of services claim, $150,000.00 is allocated to settle the Medicaid lien with the

New York City Human Resources Administration, Department of Social Services, $1,000,000.00 is allocated to structure the portion of the settlement agreement by purchasing annuities, with the remainder of the non-Fund part of the settlement agreement allocated to the trust, is fair, reasonable and adequate and in the best interest of JJ.

<u>Whether Attorney's Fees Are Reasonable</u>

In connection with the instant motion, Awad submitted his affirmation, dated June 8, 2012, with exhibits, including Exhibit M, "Timeline Report," which he contends represents "the contemporaneous time records as kept and generated by our firm in our office's case management program, Time Matters, to support, describe, corroborate and supplement our general discussion of services performed." Awad contends that, "in determining the reasonableness of a contingency fee," the Court should consider factors such as:

> a) the time and labor required, the novelty and difficulty of the question involved, and the skill requisite to perform the legal services properly; b) the fee customarily charged in the New York City metropolitan area for representation in medical malpractice matters; c) the results obtained with this multimillion dollar settlement; d) the nature and length of our professional relationship with Equisha Jacobs and Jacques Jacobs, her son; e) the experience, reputation and ability of this law firm and the partner performing the services in this matter.

Awad and his law firm obtained a settlement agreement that is in the best interest of JJ, and the attorney's fees requested, $741,098.54, are approved by the Court, since they are reasonable and within the statutory limitations provided by New York law and the Federal Tort Claims Act. <u>See</u> JL § 474-a, 28 U.S.C. § 2678. Awad and his law firm have extensive experience in matters similar to this action, involving medical malpractice generally and obstetrical negligence specifically. Awad's reputation in the medical malpractice field is demonstrated by his various appointments, including serving as Chair of Medical Malpractice

committees and on the New York State Governor's task force on medical malpractice.  Awad

and his law firm have been involved with the plaintiffs since February 2006 and "will remain

available as counsel to Jacques or parental guardian and any legal guardian appointed for the

next ten years without further charge."  The attorney's fees requested in this action appear to be

within the range of fees customarily charged and approved in medical malpractice cases in New

York City involving neurologically impaired infants, as demonstrated in Awad's affirmation: (a)

$751,905.14, on a $6.1 million recovery in the case bearing Index Number 6987/00, Queens

County; (b) $738,725.61, on a $5.9 million recovery in the case bearing Index Number

22308/04, Bronx County; and (c) $747,227.39, on a $6 million recovery in the case bearing

Index Number 17305/97, Bronx County.

Although the Court found certain deficiencies in the law firm's previous submissions,

after the Court's determination that the MIF applies in this case, Awad and his law firm

negotiated successfully the instant settlement agreement with the defendants, allocating 25% of

the total settlement amount to the MIF, and 75% of the total settlement amount to the non-MIF,

which is a reasonable, fair and adequate allocation under the circumstances of this case and is in

the best interest of JJ.  Additionally, counsel negotiated a partially structured settlement

agreement successfully, which is in the best interest of JJ.  Upon careful review of the record and

the submissions in connection with the instant motion, the Court also approves $39,014.61 in

disbursements sought by the law firm, since the disbursements are reasonable and proper.  The

allocation of the attorney's fees is calculated and allocated properly, based on the net sum

recovered, as required pursuant to New York law.  See JL § 474-a, PHL § 2999-j(14).

Whether Compensation for Guardian Ad Litem's Services Is Reasonable

Tomsky submitted his affidavit detailing the services provided since he accepted his

37

appointment as JJ's guardian ad litem, by executing and filing his consent to appointment, on

February 29, 2012.  Tomsky explained that he had no interest in this proceeding adverse to JJ's

interests or any connection or business with the attorneys for any of the parties in the action.

Tomsky's affidavit included the time records he kept, showing he "devoted more than 106.50

hours of time" to this matter including: (1) 9 hours spent attending and testifying at the August 2,

2012 infant compromise hearing; (2) numerous communications had with the persons involved

in negotiating the settlement agreement in this action; (3) reviews of various documents;

(4)  attendance at different meetings; and (5) preparation of his affidavit.  Tomsky's $350 hourly

rate is reasonable in light of Tomsky's extensive experience serving as a guardian ad litem in

similar cases.  The Court finds that Tomsky discharged his duties as JJ's guardian ad litem

satisfactorily, and the compensation he seeks for his services is reasonable.

### CONCLUSION

For the foregoing reasons, the Court approves the proposed settlement agreement reached

in this action, because it is in the best interest of the infant and authorizes: (a) the creation of the

trust, as provided by the settlement agreement; (b) the payment to the infant's counsel of

reasonable attorney's fees ($741,098.54) and disbursements ($39,014.61), as provided by the

settlement agreement; and (c) the payment to the infant's guardian ad litem, of reasonable

compensation for his services ($33,425.00), as provided by the settlement agreement.

Accordingly, Tomsky's motion, made pursuant to Local Civil Rule 83.2, Docket Entry No. 106,

is granted.

On or before November 21, 2012, the plaintiffs shall file the: (1) settlement agreement;

(2) trust; and (3) parties' stipulation of discontinuance.

Dated:  New York, New York                    SO ORDERED:
    November 13, 2012

*Kevin Nathaniel Fox*

KEVIN NATHANIEL FOX
UNITED STATES MAGISTRATE JUDGE